1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

```
-----------------------------x
                             :
JOHN DOE                     :
                             :
               Plaintiff     :
                             :
          versus             : Civil Action Number
                             :
MARYMOUNT UNIVERSITY, et al  : 1:17-CV-401
                             :
               Defendants.:
-----------------------------x
```

September 15, 2017

The above-entitled Motion to Dismiss was continued before the Honorable T.S. Ellis, III, United States District Judge.

THIS TRANSCRIPT REPRESENTS THE PRODUCT OF AN OFFICIAL REPORTER, ENGAGED BY THE COURT, WHO HAS PERSONALLY CERTIFIED THAT IT REPRESENTS TESTIMONY AND PROCEEDINGS OF THE CASE AS RECORDED.

2

1                    A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3               Justin Emerson Dillon, Esquire
                Kaiser Dillon PLLC
4               1401 K Street NW
                Suite 600
5               Washington, DC 20005

6    FOR THE DEFENDANT JANE ROE:

7               Jason Richard Waters, Esquire
                Wilson Elser Moskowitz Edelman & Dicker LLP
8               (McLean)
                8444 Westpark Dr
9               Suite 510
                McLean, VA 22102

10

11

12

13

14

15

16

17

18

19

20   OFFICIAL UNITED STATES COURT REPORTER:

21              MS. TONIA M. HARRIS, RPR
                United States District Court
22              Eastern District of Virginia
                401 Courthouse Square
23              Tenth Floor
                Alexandria, VA 22314
24              703-646-1438

25

3

1        **P R O C E E D I N G S**

2

3            THE DEPUTY CLERK:  John Doe vs. Marymount

4    University, et al.  Civil Case Number 1:17-CV-401.

5            MR. DILLON:  Good morning, Your Honor.  Justin

6    Dillon for plaintiff, John Doe.

7            THE COURT:  All right.  And who's here for the

8    defendant?

9            MR. WATERS:  Good morning, Your Honor.  Jason Waters

10   for defendant, Jane Roe.

11           THE COURT:  And is that the only defendant that's at

12   issue today?

13           MR. DILLON:  Yes, Your Honor.

14           MR. WATERS:  Yes, Your Honor.

15           THE COURT:  And that's because the plaintiff has

16   alleged a defamation against that person alone, is that

17   correct?

18           MR. WATERS:  That's correct, Your Honor.  There's an

19   assault count.

20           THE COURT:  And now the -- that defendant seeks a

21   dismissal under 12(b), because it's barred under the single

22   publication statute of limitations rule.  The statute

23   beginning to run in November.  And the question is whether

24   there's a single publication issue.

25               All right.  Let me hear first -- and also there's

4

1    a -- an immunity issue and a qualified immunity issue.

2           All right.  Let me hear first from the movant.  Make

3    it brief, because if you've already said what you're going to

4    tell me in your brief, you're wasting my time and the time of

5    everyone else in here.

6           MR. WATERS:  Of course, Your Honor.  May I please

7    the Court.  Ms. Roe is moving --

8           THE COURT:  Let me -- Mr. Fitzpatrick, you're here

9    for a plea?

10          (Discussion off the record.)

11          THE COURT:  All right.  Go ahead, sir.

12          MR. WATERS:  Thank you, Your Honor.  I believe that

13   the motion papers have quite substantially limited the issues.

14          THE COURT:  Mr. Simms is here.

15          (Discussion off the record.)

16          MR. WATERS:  Thank you, Your Honor.

17          The motion papers in this case have quite

18   substantially limited the issues with regard to the statements

19   that are at issue with regard to my client.  There were a

20   variety of statements attributed to Ms. Roe in the complaint

21   and I think that in the motion practice we really limited them

22   down to only two statements that were made within one year of

23   filing.  These are the statements that are allegedly made in a

24   victim impact statement in June of 2016 and an appellate

25   response in July of 2016.  I think -- I understand counsel has

5

1    agreed that none of the proceedings statements that were

2    attributed to my client were made within one year of her

3    filing.  So the only statements that we're looking at for the

4    defamation per se claim are the ones made in June and July of

5    2016.

6          So the first issue is whether, under Your Honor's

7    decision in *Katz v. Odin, Feldman*, whether those statements

8    are timely and adequately pleaded to state a defamation claim.

9          We also have, as I understand it, agreed that the

10   statements that were made in June and July of 2016 are at

11   least qualified or -- enjoy qualified immunity under Virginia

12   law meaning that they may only proceed against my client if

13   the plaintiff is able to establish malice and allege

14   sufficient facts to show that the evidence would be able to

15   establish malice by a clear and convincing evidence.

16         So the -- the three issues are:  First, whether the

17   June and July statements are timely and adequately pleaded.

18   Second, whether those statements which were made in the

19   context of a Title IX investigation and pursuant to federal

20   statute -- conducted pursuant to federal statute enjoy

21   absolute immunity under Virginia law in the First Amendment.

22   And third, whether the statements -- whether the complaint

23   adequately stated facts that would show malice in order to

24   allow them to go forward if absolute immunity is not available

25   to them in this case.  Regarding the statute of limitations

6

1   issue, if you look at the --

2          THE COURT:  Tell me again what you -- what you claim

3   are the only two statements at issue?

4          MR. WATERS:  Yes, Your Honor.

5          In the single count against my client, there are two

6   statements that were made within one year of March 31, 2017.

7   It is a June victim impact statement and a July appellate

8   response.  These were submitted as part of the Title IX

9   investigation.  Plaintiff counsel does not allege the contents

10  of those statements.  The allegations in the complaint are

11  limited to:  Upon information and belief Ms. Roe stated that

12  there was a sexual assault.

13         What's critical about those two statements is that

14  the allegations mirror the same allegations regarding prior,

15  admittedly untimely statements.  So in our view the *Katz* case

16  is actually quite controlling here, particularly Your Honor's

17  discussion about defamation and continuing tort.  As you may

18  recall in the *Katz* case, one of the arguments that the

19  plaintiff made was that the letter that was submitted to the

20  arbitration panel was subsequently repeated by counsel at the

21  arbitration hearing.  And that because those statements were

22  repeated, it constituted a continuing tort and Your Honor

23  recognized that's not the case.  Both in the *Katz* case and

24  then in the *Lewis v. Gupta* case.

25         It is clear to us and we believe, based on the --

7

1   also the motion practice as well as the pleadings, that while

2   it's not characterized as trying to fit this in as a

3   continuing tort, that's precisely what the plaintiff is trying

4   to do here.  Because the plaintiff doesn't know what the

5   contents of the statements were made in June and July of 2016.

6   The allegations are made purely upon information and belief.

7   And there's no other information about those statements

8   included in the complaint.  And if Your Honor looks at the

9   complaint in the context of those two statements disregarding

10  all of the information in the allegation with regard to

11  statements that are attributed to, are long before the

12  admittedly untimely statements, there's simply not enough to

13  qualify under either Rule 8's pleading standards or the

14  Virginia requirement that the def -- and defamatory words be

15  pleaded in haec verba or the precise words.

16          THE COURT:  You understand that Virginia pleading

17  rules don't apply here.  It's the federal rules of civil

18  procedure.

19          MR. WATERS:  Of course, Your Honor.  Yes, and in

20  that regard, I note that we cited two cases in our brief that

21  both -- both Eastern District of Virginia cases, I believe

22  within the last five years, the *McGuire* and the *Golumamine*

23  case, I believe, that indicated that the Eastern District will

24  look to the Virginia pleading standards with regards to the

25  sufficiency of an allegation on a defamation claim.

1          Now I have to admit in candor, after we filed our

2   reply brief in this case we did learn of a decision from the

3   Western District of Virginia.  This came out August 3, 2017.

4   This is the *Cameron Jackson v. Liberty University* case, where

5   the Western District in an unreported decision, citing an

6   unreported Fourth Circuit decision, indicated that essentially

7   that the pleading requirements under Rule 8 did not require

8   the precise words, but we seem to have this conflict between

9   the Eastern District cases, the *McGuire* case and the

10  *Golumamine* case that we cited, which is that the Eastern

11  District courts will look to that statute.

12          THE COURT:  Well, it doesn't say that they're going

13  to be governed by that.

14          MR. WATERS:  No, but it is something that the courts

15  are looking at and considering.

16          THE COURT:  I think that's pretty clear that Rule --

17  that the federal rules apply, not state pleading rules.

18          MR. WATERS:  Well, I'm not asking the Court to

19  apply --

20          THE COURT:  I'm not an author of any of those, am I?

21          MR. WATERS:  No, Your Honor.

22          THE COURT:  I wouldn't have done that.

23          MR. WATERS:  I'm not asking the Court to apply state

24  pleading rules, but I am asking the Court to consider, when

25  we're looking at the Virginia tort of defamation, this is a

9

1   state law tort claim.  We're looking at the sufficiency of

2   these particular pleadings, the only thing that is said about

3   the statements in June and July of 2016 is that she said there

4   was a sexual assault.  And only upon information and belief,

5   which even under -- under cases interpreting Rule 8, the

6   qualifier upon information and belief must be viewed with

7   great suspicion, because it indicates that the allegations are

8   tenuous at best.  But what we're looking at is the plaintiff

9   doesn't know what was actually said in those two statements.

10  But the plaintiff does have a good idea and it does know what

11  was stated much earlier in untimely statements.

12          So when you compare this with the *Katz v. Odin,*

13  *Feldman* case, it's pretty clear what we're really trying to do

14  is kind of argue that this is essentially a continuing tort.

15  Arguing that these June and July statements in the exact same

16  context, okay, the Title IX investigation, essentially

17  continue the tort or relate it back to its original statements

18  and it's simply both from the Court's decision I believe in

19  *Katz* as well as applicable decisions interpreting Rule 8

20  indicates that this is not sufficiently pleaded to state a

21  defamation claim for those two statements.  As well as to show

22  that those two statements frankly are untimely, because the

23  claim with regard to those two statements is untimely because

24  essentially we're trying to relate them back to the prior

25  comments.

1          Should the Court disagree that the claims with

2   regard to those two statements are either untimely or that

3   those claims are sufficiently pleaded, we respectfully submit

4   to the Court that these statements were made in the context

5   that enjoys absolute immunity under Virginia law and under the

6   First Amendment.

7          And again, continuing a trend from the preceding

8   case we ask your Court to -- Your Honor to review the Court's

9   decision in *Katz v. Odin, Feldman*.

10         The -- these Title IX proceedings from the student's

11  perspective are unquestionably quasi judicial matters.

12  There's no question that a student who is before the

13  university with a grievance of sexual assault is putting

14  themselves in a position where the university, pursuant to a

15  federal statute, must investigate and adjudicate the events

16  that transpired and form the basis of the complaint.

17         There's no question from their perspective that the

18  university will be making a decision as to essentially their

19  rights as students of that campus and that this university

20  must do so pursuant to federal law.  In fact, the plaintiff's

21  complaint itself is replete with language that shows the quasi

22  judicial nature of this.

23         There will be an investigation.  There will be an

24  adjudication.  There's a standard of determination, which is

25  preponderance of the evidence.  There is notice.  There are

1    opportunities for appeal.  There's an equal opportunity under

2    the policies to be heard.  The university's investigators

3    prepare a report.  The students have the opportunity to

4    comment on their report.  They have an opportunity to submit

5    evidence and identify witnesses.

6            THE COURT:  All of that state involvement is

7    sufficient to convert what the defendant Marymount does to

8    state action sufficient to trigger the 14th Amendment?

9            MR. WATERS:  I'm sorry, Your Honor.  I don't

10   understand your question.

11           THE COURT:  You're emphasizing the state

12   involvement.  I'm asking whether that state involvement is

13   sufficient to trigger the application to Marymount of the 14th

14   Amendment in the procedures they use to investigative these

15   matters.

16           MR. WATERS:  Your Honor, I apologize if I've

17   misspoken.  I'm not intending to emphasize state involvement.

18   What my intention is is to show the characteristics of this

19   proceeding under Marymount's procedures pursuant to federal

20   law demonstrates that it has the nature --

21           THE COURT:  All right.  Pursuant to federal law,

22   does that -- does that mean that the 14th Amendment is

23   triggered so that Mr. Doe here would have 14th Amendment right

24   to due to process in the way he's treated by Marymount?

25           MR. WATERS:  Well, I don't represent Marymount and

1  I -- and I'm not making any representations with regard to the

2  application of the 14th Amendment.

3          THE COURT:  Refresh my recollection, which defendant

4  do you represent?

5          MR. WATERS:  Jane Roe, the student.  My client

6  complained of being sexually assaulted to the university which

7  conducted the investigation.

8          THE COURT:  All right.

9          MR. WATERS:  The applicable inquiry under Virginia

10  law with regard to absolute immunity is the quasi judicial

11  nature or the characteristics of the proceeding that --

12  whether they resemble a judicial proceeding.  What I'm

13  arguing, Your Honor is that the characteristics of this

14  proceeding, according to the plaintiff's own pleadings and the

15  policy that existed for these students, resembled very much a

16  quasi judicial proceeding such that the statements the student

17  makes in the context of this proceeding should be absolutely

18  immune, because to do otherwise would chill speech on such a

19  critical issue, a sexual assault on campus.

20          If anything else, the absolute immunity encourages

21  the frank and robust litigation of these issues within the

22  context of the Title IX investigations.

23          THE COURT:  Well, they are litigated.  You know

24  they're not bound by due process or anything else?

25          MR. WATERS:  But --

1        THE COURT:  There isn't any robust litigation of

2   these things by Marymount.  Give me a break.

3        MR. WATERS:  Well, their procedures include the

4   elements that I've outlined.  And as far as the students are

5   concerned, they're bound by the university's procedures.  They

6   must proceed under the university's rules.  This isn't a

7   situation where the student, such as a university may, for

8   example, seek absolute immunity for its own statements with --

9   and to -- to essentially cover its own perhaps deficiencies on

10  it -- with regard to due process.  The students don't have a

11  choice here.

12       THE COURT:  I'm merely cautioning you about talking

13  about robust litigation.  It isn't that.

14       MR. WATERS:  My point, Your Honor, and I -- and I --

15  and I understand.  But my point was, by affording absolute

16  immunity to these statements it allows the students who are

17  the victims of sexual assault or being accused of sexual

18  assault, falsely or correctly, of having the protection to

19  speak candidly and frankly with their universities when these

20  investigations are underway.  And that is simply my point.

21       And I would argue that this is quite analogous to

22  the *Katz* situation which the fee arbitration proceeding in

23  that matter was also done pursuant to the statute.  It was

24  done pursuant to the Virginia fee arbitration statute.

25       So, there are a variety of characteristics that make

1   this proceeding resemble a judicial proceeding and

2   particularly from the perspective of the students. Should

3   absolute immunity not apply to the statements? I believe

4   counsel and I agree that the statements that we're looking at,

5   only the June and July 2016 statements enjoy at least

6   qualified immunity requiring sufficient allegations to show

7   that the plaintiff be able to prove by clear and convincing

8   evidence that the statements were made maliciously. And this

9   is particularly significant when you look at the pleadings in

10  this case as well as the plaintiff's response.

11          All of the allegations -- first of all, the

12  allegations of the complaint simply state they were made

13  maliciously. There is no factual predicate given in the

14  actual account with regard to the basis for the malice claim.

15          When you look at the other allegations throughout

16  the complaint with regard to conduct as well as the ones that

17  are cited to in opposition to our motion, counsel is looking

18  at things that happened the night of the event, November 8th

19  of 2014, and asking the Court to say that those events suggest

20  that the statements nearly two years later were made

21  maliciously. There's absolutely nothing in the complaint or

22  the count itself or the opposition to our motion that suggest

23  the context of those statements made in June and July of 2016.

24  In fact, the complaint shows that my client was asked to give

25  these statements by the university as it was proceeding in

1   this investigation.  There's no indication that she was acting

2   out of a sense of revenge, there's no indication that she was

3   acting out of feelings of rejection.  It was with regard to

4   this.  But the only statements that are or the only acts and

5   conduct that were pointed to, to show, well this could have

6   been done maliciously are 8 to 18 months prior to the

7   statements that are the only issues in the case.

8           And again, the recent decision regarding Liberty

9   University is actually illustrative in that respect because

10  that Court allowed the claim to go forward on qualified

11  privilege with regard to the malice question.  And in that

12  case the student -- the complaining student, the victim

13  student, were saying things like expletive Liberty University

14  made statements indicating an intent to gain retribution

15  against the football team, which was involved in the claim.

16  And made particularly pointed statements about suggested that

17  the assault never actually happened.

18          So when you look at these particular statements, in

19  the context of Title IX, given at the request of the Title IX

20  adjudicator and without any context that suggest that in June

21  or July of 2016 she's acting in any form of malice.  We

22  respectfully submit for the reasons that we've cited on all

23  three of those reasons in the issues in this case, the

24  complaint should be dismissed with prejudice without leave to

25  amend.

1          THE COURT:  All right.

2          MR. DILLON:  Thank you, Your Honor.  May it please

3   the Court.  I agree completely with Mr. Waters' framing of the

4   issues.  I think we're on all fours there.

5          THE COURT:  So it's two statements that we're

6   focusing on?

7          MR. DILLON:  That's correct, Your Honor.

8          So I want to start and just provide a little bit of

9   context and I'll go to the three issues.  This is not the

10  typical kind of sexual assault case.  Mr. Doe isn't someone

11  who lost a swearing contest, is upset about that, and is now

12  basically going after the complainant just because he believes

13  they should have believed him.  It's a lot more than that.  I

14  can highlight three particular pieces of evidence that show or

15  strongly suggest that this is a false and defamatory

16  allegation.

17          Number one, the text messages.  That night about

18  roughly an hour-and-a-half after what the complainant later

19  alleged would be an incredibly violent sexual assault in which

20  the -- Mr. Doe literally chased her as she ran away.  He

21  texted her saying, "Hey, y'all ain't going out tonight?"  And

22  she responded, "I'm eating pizza, ha ha."  So you got sort of

23  a fun light-hearted text exchange between them just

24  hour-and-a-half after, not some sort of, you know, drunken

25  hookup that both of them sobered up from but a violent, very

1   violent sexual assault.

2          But number two, you have her own female roommate

3   L.J. who said that when Ms. Roe came back from her dorm she

4   was, quote, happy; quote, giddy; said that Mr. Doe was quote,

5   good with his tongue and showed off the hickeys that he gave

6   her.

7          THE COURT:  The what?

8          MR. DILLON:  Showed off the hickeys that he gave

9   her.  And that she started to, only when she continued to

10  drink and was ignored by the people who didn't want to hear

11  about this interaction, did she start to take -- her

12  conversations started to take a darker turn, when she wasn't

13  getting the attention that she wanted.

14         And then finally, the third factor, is just the

15  sheer physical impossibility of what she alleges.  I mean

16  there's a lot of it.  But I think the -- the risk of being

17  graphic, Your Honor, it's her allegations that while she was

18  standing up Mr. Doe took his entire fist and forced it inside

19  of her vagina.  You think anyone with a passing knowledge of

20  human biology will understand that is impossible, but that is

21  what she said.  Not punched, put the whole thing inside.

22         So, I think that is important background.  This

23  isn't just they should have believed me.  It's, I have

24  contemporaneous evidence about what actually happened that

25  night in the falsity of her statements.

1    So with that as background, I'll go through the same

2  factors that Mr. Waters went through in the same order.  First

3  with respect to the statute of limitations, Mr. Waters makes

4  much of the fact that we don't know what was said in June and

5  July of 2016.  And as we made quite clear in our pleading,

6  Your Honor, that's because Marymount won't tell us, which is

7  actually a violation of federal law.  Under FERPA, the Federal

8  [sic] Educational Records and Privacy Act, they're supposed to

9  give him a copy of his educational record which would include

10  everything here.  He asked for it after this whole thing was

11  over in September of last year.  They refused to give it to

12  him.  When he asked for a redacted version, he was told by

13  defendant McMurdock that there's no way that we can redact it

14  enough so that you can't figure out who was saying what.  Even

15  when, of course, he knows who everybody is.  And what we were

16  asking for included the victim impact statement of the

17  complainant and he knows who she is, and her response to his

18  appeal, and again he knows who she is.

19    So it would be -- I don't know what the word is --

20  more than absurd to hold Mr. Doe responsible for not knowing

21  the content of secret ex parte statements that he asked to

22  look at and was not allowed to look at.  So -- and I think

23  that's point one.

24    Point two is, the idea that you can't -- Mr. Waters

25  wants to make this a temporal distinction about, Well, we

1   don't know what she said in those statements and how that

2   relates back.  We're not alleging any sort of continuing tort.

3   This isn't a Katz case, it's a *Lewis v. Gupta* case.  Right?  I

4   mean this is a day where I think we're just quoting Your Honor

5   over and over again.  But Your Honor's opinion in *Lewis v.*

6   *Gupta*, and this is on all fours on that.  Here, just like in

7   *Lewis v. Gupta*, you have an initial report -- allegedly false

8   report of sexual assault.  Here, just like in *Lewis v. Gupta*,

9   that initial report is time barred.

10          Here, just like in *Lewis v. Gupta*, you have two

11  later additional statements to the law enforcement authorities

12  in *Lewis v. Gupta* and here in the Title IX process.  And in

13  *Lewis v. Gupta* Your Honor held that although the first report

14  was indeed time barred, it is sort of Hornbook law, and it's

15  even so basic it's in every statement, that when you repeat a

16  defamatory statement, it is a new tort each time.  That is

17  what you held.

18          This isn't a Katz case.  And I understand what they

19  want to do with the *Katz* case.  But in *Katz* it's different.

20  In *Katz* there was a defamatory letter that was sent to an

21  arbitration hearing and then talked about.  But there was only

22  one -- and they were just litigating the content of the

23  defamatory statement.  So this is -- and this -- so this is

24  not at all a *Katz* case.  It is on all fours with *Lewis v.*

25  *Gupta*.  And that makes sense.  I mean again it's in the

1   restatement.  It is just Hornbook law that if you say it

2   later, according to law enforcement, that it's a new tort.

3           So that's all I have to say on the limitations issue

4   unless the Court has any questions on that.

5           With respect to absolute privilege or qualified

6   privilege, Mr. Waters does his level best to talk about -- to

7   sort of make this process at Marymount sound quasi judicial.

8   I would say it is as similar to a judicial proceeding as a

9   raccoon is to a horse.  And that they both have four legs, but

10  things tend to diverge after that.  Okay.  Here is what you

11  don't get at Marymount:  You don't get cross-examination, you

12  aren't allowed to subpoena witnesses, you aren't even allowed

13  to speak to witnesses, anybody in the case at all.  Not just

14  the complainant.  You literally can't interview witnesses.

15  You're not allowed to see the actual evidence against you.

16  You just get the investigators' statements, summarizing

17  witness testimony.  There is, of course, no threat of perjury.

18  Attorneys can serve as advisors in these processes, but they

19  are not even allowed to talk.  And I can tell you from

20  personal experience are reprimanded when they try to.

21          And finally, and this is -- and I think it's hard to

22  pick -- the most -- the craziest part of the policy, but you

23  aren't even allowed to meet with the person making the

24  decision.  The investigators make this investigative report,

25  they give it to you and then they hold back the juicy bit that

1   has the determination about whether he did it or not.  You

2   don't get to see that.  That then goes to the adjudicator who

3   you never get to meet with.  We tried.  We asked for it.  They

4   said no.

5           THE COURT:  I take it you were counsel in the Doe

6   case that I had previously?

7           MR. DILLON:  I was, Your Honor.

8           THE COURT:  I take it you've considered carefully

9   whether this case could fit under the 14th Amendment?

10          MR. DILLON:  You know, Your Honor, Jed Rubenfeld has

11  a very interesting article out --

12          THE COURT:  Who has?

13          MR. DILLON:  A Yale law professor has an interesting

14  article that came out earlier this year raising exactly this

15  claim that basically -- or argument that essentially has the

16  education department so commandeered the Title IX process that

17  it converts private actors into state actors.  I think it is a

18  fascinating intellectual argument that I may make one day but

19  it's aggressive and so I'm trying to be modest.

20          THE COURT:  When was the article published?

21          MR. DILLON:  Earlier this year.  I don't remember

22  exactly but it was Jed Rubenfeld.  I think it was in the Yale

23  Law Journal, but it was, I think 2017, maybe late 2016, but

24  within the last 12 months.  So it is an interesting argument

25  that I may make one day, but I'm not making today.

1          THE COURT:  Well, your cocounsel was on his way to

2    making it.

3          MR. DILLON:  If he wants to, and I think quite

4    rightly, he's not here representing Marymount.

5          So when you don't even get to meet with the person

6    making the decision, it's kind of hard to call that quasi

7    judicial.  And that's, you know, the *Elder v. Holland* case.

8    Right?  And Virginia Supreme Court said that the -- the

9    process for police discipline was not quasi judicial such that

10   you got absolute immunity as the privilege because there was

11   no subpoena power, you can't compel witnesses, no perjury

12   penalty, no rules of evidence.  The same thing in *Cleavinger*,

13   no compulsion or cross-examination, no discovery, no verbatim

14   transcript, no rules of evidence.

15         And also, Your Honor, qualified privilege makes

16   sense here.  Right?  I mean it just does.  You only have a

17   qualified privilege, you only -- excuse me -- you only have

18   qualified privilege if you lie to the police.  And when you --

19   and in the police process, of course, you get all the

20   constitutional protections.  If that only gets qualified

21   privilege, why would statements made, and in context, where

22   you have far fewer rights get more privilege.  Plus imagine

23   what the incentives you would create, right; what would

24   absolute privilege mean if you did that?  You would have

25   complete immunity from false statements in the investigation

23

1    process.  So you got a bad break.  Well, there's a way around

2    that.  Go to the Title IX office and say your professor

3    sexually harassed.  And he can't do anything about it as long

4    as you only stay at the Title IX office.

5            You're mad at your roommate, you don't like him, he

6    smells bad, he smokes.  Say you saw him cheating and there

7    would be literally no remedy for that.  That is crazy.  And

8    that's not the law.

9            So that takes us to malice, Your Honor.  I think we

10   are firmly in and we've admitted that we're in the qualified

11   privilege land.  And I think the question here is, Does

12   falsely accusing someone of sexual assault constitute malice?

13   I think that to sort of ask that question, Your Honor, is to

14   answer it.  And again, I want to distinguish what kind of case

15   this isn't.  This isn't a case where you don't have any other

16   evidence like we have with the text messages or the roommate

17   where you can maybe believe that someone, a complainant

18   managed to convince herself, for whatever reason, that

19   something she didn't like was nonconsensual.  That's not this.

20   This wasn't a drinking case or anything like that.  This was

21   an alleged violent sexual assault which she went right back to

22   her dorm room and praised the alleged perpetrator as being

23   good with his tongue and all those things.

24           So malice, of course, doesn't include just actual

25   malice.  It includes statements that were made with such

1  indifference and recklessness as to amount to a wanton or

2  willful disregard of the rights of the plaintiff.

3         What's the motive here?  Mr. Waters seeks, I think,

4  gainly, to say you can't look back at the original statements,

5  to seek motive about for what she later said in July -- June

6  and July of 2016.  I don't really see the -- I don't see the

7  logic of that to be honest.  Of course you can.  You know

8  it's -- she's falsely reporting the same sort of operative

9  facts.  And here, her own roommate said that she -- she wasn't

10 getting the attention that she wants and she, you know, made

11 it up for this reason.  I think sort of implies that she may

12 have made it up for this reason.  And that she does have a

13 tendency, according to her own female roommate, sort of cast

14 herself as a victim.  Again, we allege these things in our

15 complaint.

16        This is similar, Your Honor.  It may sound crazy to

17 say, Why would someone do this?  Why would you allege this

18 violent sexual assault just because you want attention?  I

19 don't know.  Let's think of the *Jackie* case, the UVA case,

20 where, as I think the Washington Post has now made clear to

21 everybody in -- and I think so have the court system, what did

22 you have there, Jackie fabricated a sexual assault by a bunch

23 of guys in a fraternity in order to get another guy to like

24 her and sympathize with her.  She may have had nothing against

25 the fraternity guys.  I think they were just maybe a means to

1    an end, which was to get the other guy to like her.  But, of

2    course, I don't think anybody could look at that and say that

3    is such a statement of an alleged gang rape was not made with

4    actual malice.  And I think again that's here.  You don't --

5    we don't have to at this stage of the process, Your Honor, the

6    motion to dismiss stage, to plum her mind to know exactly what

7    happened.  But I think we can infer based on everything --

8    based on the very fact of a false allegation of sexual assault

9    and what that does and the fact that she again pursues it all

10   the way through June and July of last year that it was made

11   with, at a minimum, wanton or willful disregard, gross

12   indifference of recklessness as to amount to a wanton and

13   willful disregard of the rights of the plaintiff.

14          Again, this case might be different if it were two

15   people who got drunk at a bar, went home, slept together and

16   the complainant wakes up the next day and says "I was too

17   drunk to consent."  That might not be wanton and willful.

18   This is not that case.  This is a case with more

19   contemporaneous evidence.  There is no real significant

20   alcohol consumption involved and it's an allegedly violent

21   rape, that they're texting about in a cutesy way just an

22   hour-and-a-half later.

23          And that's all I have.

24          THE COURT:  All right.

25          MR. DILLON:  Thank you, Your Honor.

26

1          THE COURT:  Yes.  Do you have anything you want to

2     add?

3          MR. WATERS:  Very briefly, Your Honor.

4          Counsel mentions the text messages, but he omits the

5     fact that a few weeks after the fact there was a text exchange

6     where my client told Mr. Doe that she felt that he was

7     aggressive with her and he apologized.

8          So I think that the arguments with respect to the

9     truth and falsity of this have to be viewed in the context of

10    the fact that, one, we have an apology and --

11         THE COURT:  I don't have to make a determination

12    about truth and falsity in this stage, do I?

13         MR. WATERS:  Well, neither does "eating pizza, ha

14    ha" have -- bear on the truth or falsity of it any less, I

15    believe, Your Honor.

16         With respect to the absolute immunity argument, to

17    be clear I'm not making a 14th Amendment argument, I'm making

18    an argument under the Virginia Supreme Court standards with

19    regard to when absolute immunity applies.  And what we're

20    looking at are the characteristics of the proceeding and the

21    ability to subpoena witnesses or to engage in confrontation to

22    confront the witness is not the sine qua non of absolute

23    immunity under Virginia law.  They may be considerations but

24    they are not the absolute determinative factors.  And when you

25    look at the plaintiff's complaint in its entirety, I believe

27

1   that there's more than sufficient allegations to show that

2   these procedures were quasi judicial.

3           THE COURT:  Tell me what these two -- the dates of

4   these two statements again?

5           MR. WATERS:  June 2016 and July 2016.

6           THE COURT:  Both of those are within the statute of

7   limitations?

8           MR. WATERS:  They were, Your Honor.

9           THE COURT:  So the single publication rule, all of

10  that is sort of swept away?

11          MR. WATERS:  Well, our argument, Your Honor, is this

12  is much like the *Katz* situation where there was an oral

13  representation of the statements that were made in the

14  original letter and that when you look at these statements, as

15  they are pleaded, it is essentially an attempt to call it a

16  republication but it really is an attempt to boot strap off

17  the earlier statements in a continuing tort type of way.

18          And then with regard to qualified immunity, there is

19  zero context alleged in the complaint with respect to when the

20  June and July statements were made except for the allegations

21  that show that these statements were made at the request of

22  the Title IX adjudicator.  Under those circumstances we

23  submit, Your Honor, that there is no -- not sufficient to meet

24  the malice standard to allow the plaintiff to proceed.

25          THE COURT:  The matter is before the Court on a

1  motion to dismiss at threshold level.

2       MR. DILLON:  Thank you, Your Honor.

3       THE COURT:  I am puzzled -- yes, did you --

4       MR. DILLON:  No, I said thank you.  Sorry.

5       THE COURT:  -- raises some interesting questions.

6  But we need to get about litigating this case and I've got to

7  resolve it one way or the other.  I am going to write briefly

8  on these issues.  Very briefly.  I think there's -- that the

9  statements are not barred by the statute of limitations.  And

10 I don't think qualified or absolute immunity apply, but I'll

11 write about that to give you a bit more context.

12      It's sad to me that these things progress the way

13 they have.  But then these are young people and for some

14 reason -- I mean, I think, today these are much better times

15 than 50 years ago.  Much better.  Lots of things are better in

16 our society than they were 50 years ago.  It's by far better.

17 Especially if you're a woman or an African-American, much

18 better today.

19      When I first came to this country, there were

20 separate drinking fountains, separate places for people to sit

21 depending on the color of their skin.  Thank goodness we don't

22 have that anymore.

23      But what we don't have anymore and what we did have

24 back then is young people had personal responsibility.  And

25 these are young people at these universities.  I went to a

1  university when I was much younger and saw other universities.

2  Now, there were probably a lot things that happened at

3  universities that I never knew about.  But I can tell that you

4  when I was at a student of university I never heard of drugs,

5  never saw any drugs, never heard of any drugs.  The big thing

6  was 3.2 beer.  Sexual assault was unheard of.  It's just a

7  different world in that respect and I'm sorry about that,

8  because this is the trouble young people get into.

9         But this -- the motion to dismiss is denied for

10 reasons that I'm going to state more fully.  But these are

11 young people who need to get on with their lives and need to

12 begin to accept the responsibility of being adults.  I doubt

13 that Jane Roe or Doe are juveniles anymore.  They are both

14 adults now, aren't they?

15        MR. WATERS:  Yes, Your Honor.

16        THE COURT:  Well, they've got to begin living like

17 adults, supporting themselves, getting a job, doing

18 responsible things, not violating the law.  And one of the

19 ways they can do it, is to settle this case.  Get it out of

20 the way.  Get it done, get it behind them, lessons learned.

21 Don't do this again, don't do that again, and why they

22 shouldn't do it.  But I am going to write briefly about this.

23        Now what stage is this matter in?  And what, if

24 anything, can I do to aid the parties, including parties not

25 here, to see if they can resolve this matter?  Your client, I

1   take it, is no longer a student at Marymount?

2           MR. DILLON:  Correct, Your Honor.  He's suspended

3   for two years.

4           THE COURT:  All right.  And have you had any

5   discussions with the other defendants about how to resolve

6   this thing?

7           MR. DILLON:  Yes, Your Honor.  And at this time and

8   we've had -- I will say this, I'm sure Your Honor remembers I

9   had a good working relationship with defense counsel in the

10  George Mason case.  We weren't at each other's throats.  And I

11  think Mr. Waters and I have friendly conversations as do the

12  attorney for Marymount as well.

13          At this time, you know, we've had -- we've talked, I

14  think, in general about settlement.

15          THE COURT:  Did that case ultimately get settled?

16          MR. DILLON:  No, Your Honor, we won on summary

17  judgment.

18          THE COURT:  All right.

19          MR. DILLON:  We were in Judge Nachmanoff's chambers

20  until 1:30 in the morning for mediation that we thought was

21  going to settle, but then it didn't settle.

22          THE COURT:  But I decided it.

23          MR. DILLON:  You decided it, Your Honor.  So we're

24  open to it.

25          THE COURT:  Don't worry.  That was a 14th Amendment

31

1  case.

2          MR. DILLON:  And I --

3          THE COURT:  You should be -- your co-defendant

4  should be glad this isn't a 14th Amendment case.

5          MR. DILLON:  I'm now thinking I should amend a

6  second time.  To be honest, Your Honor, I think we are all

7  realists here, I think that when the -- if -- if we get past

8  the motion -- if the plaintiff makes it past the motion to

9  dismiss stage in a civil case, I think that sometimes changes

10 the --

11         THE COURT:  Well, I'm going to issue a very, very

12 brief opinion in this and it will move on, but the -- no

13 plaintiff is going to get rich in these things.  And no

14 defendant is going to go to bankruptcy court.  But you all

15 need to find a sensible resolution of this that puts matters

16 back in proportion to some extent.

17         MR. DILLON:  I agree with that, Your Honor.

18         THE COURT:  I beg your pardon?

19         MR. DILLON:  I agree with that.  He just

20 fundamentally, Your Honor, he just wants his reputation back.

21         And you asked me a procedural question that I did

22 not finish answering.  May I finish answering?

23         THE COURT:  Yes.

24         MR. DILLON:  I got off track.  Where we are with the

25 Marymount -- do you want me to update you on where we are with

1   the Marymount, the case against Marymount?  It's a little bit

2   complicated, so.

3           THE COURT:  Well, I might but let's go on.

4           What, if anything, can the Court do to assist

5   counsel in perhaps reaching an amicable resolution of this?

6           MR. WATERS:  May I ask for one clarification, Your

7   Honor?  Your Honor, I'm sorry.

8           The Court indicated you plan to deny our motion to

9   dismiss.  I just want to clarify --

10          THE COURT:  I'm going to issue an order today

11  denying it saying a memorandum opinion will follow.

12          MR. WATERS:  Okay.  I wanted to be clear because we

13  do have an agreement that our motion, I understand, should be

14  granted to the extent it relates to statements other than

15  those two as well as to the agreement.

16          THE COURT:  All right.  This order I enter will

17  reflect that agreement.

18          MR. WATERS:  Okay.  Thank you.  I'm sorry.

19          THE COURT:  Go on.  What can I do?

20          MR. DILLON:  I think put the three parties in a

21  room.  But I think --

22          THE COURT:  I don't get involved in settlement as

23  you know.  I don't want my judgment infected by the parties'

24  positions.  I don't like the settlement process.  And I'm,

25  more importantly, not very good at it.  Because I generally

1   end up thinking people's positions are silly.

2         MR. DILLON:  Where we are now with Marymount is we,

3   I think, argued the motion to dismiss against Marymount, I

4   want to say forgive me, Your Honor, some time -- it was

5   actually at the end of May.

6         THE COURT:  And I ruled on that?

7         MR. DILLON:  No, Your Honor, you haven't ruled on

8   that.  And then it may be because we have filed a motion to

9   amend the complaint.  And that is now fully briefed.  We filed

10  a motion to amend to add essentially a third incident at

11  Marymount the way it treated a third male student to add to

12  our Title IX claim.  So that is now fully briefed.  We filed

13  our reply brief in that on Wednesday.

14        THE COURT:  All right.  I will decide that

15  reasonably promptly.  That's enough.  And then I'll tell the

16  parties to contact -- who's the magistrate judge?

17        MR. DILLON:  Judge Nachmanoff, Your Honor.

18        THE COURT:  I'll instruct you all to contact his

19  chambers.  Thank you.

20        MR. DILLON:  Thank you, Your Honor.

21

22        **(Proceedings adjourned at 12:28 p.m.)**

23

24

25

34

## <u>CERTIFICATE OF REPORTER</u>

1

2

3      I, Tonia Harris, an Official Court Reporter for the

4  Eastern District of Virginia, do hereby certify that I

5  reported by machine shorthand, in my official capacity, the

6  proceedings had and testimony adduced upon the Motion to

7  Dismiss in the case of the **JOHN DOE versus MARYMOUNT**

8  **UNIVERSITY, et al**, Civil Action Number 1:17-CV-401, in said

9  court on the 15th day of September, 2017.

10      I further certify that the foregoing 34 pages

11  constitute the official transcript of said proceedings, as

12  taken from my machine shorthand notes, my computer realtime

13  display, together with the backup tape recording of said

14  proceedings to the best of my ability.

15      In witness whereof, I have hereto subscribed my

16  name, this the 24th day of October, 2017.

17

18

19

20

21  _____

22  Tonia M. Harris, RPR
    Official Court Reporter

23

24

25