**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:17-cv-401** |
| | ) | |
| **JANE ROE,** *et al.*, | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff, John Doe ("Doe"), brings this action against Jane Roe ("Roe") and Marymount University ("Marymount"), asserting several causes of action arising from plaintiff's suspension from Marymount following Roe's allegations of sexual assault.[1]  Specifically, against Marymount, Doe asserts s a Title IX claim, a breach of contract claim, and several common law tort claims.  Against Roe, Doe asserts a single cause of action: defamation.  Both Marymount and Roe have filed threshold motions to dismiss.  Marymount's motion to dismiss will be addressed in a separate memorandum opinion.  The sole focus here is whether Doe's defamation claim against Roe should be dismissed as a matter of law.

---

[1] Defendant Roe filed an interlocutory appeal before this memorandum opinion and the accompanying order were issued based only on statements made by the Court during oral argument. Although it appears the Fourth Circuit may be willing to exercise appellate jurisdiction over an oral ruling, *see United States v. Janati*, 374 F.3d 263, 269 (4th Cir. 2004), Roe has nevertheless failed to seek certification of the interlocutory appeal, which is required by 28 U.S.C. § 1292(b).  No such certification has issued or will issue.  *See Difelice v. U.S. Airways, Inc.*, 404 F. Supp. 2d 907, 908 (E.D. Va. 2005) ("To grant an interlocutory appeal, a district court must certify that the order sought to be appealed: '[1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation....'") (citation omitted).  Accordingly, Roe's notice of appeal is clearly improper and does not operate to deprive this Court of jurisdiction.  *See LMRT Assocs., LC v. MB Airmont Farms, LLC*, 447 B.R. 470, 474 (E.D. Va. 2011) ("Clearly improper notices of appeal cannot be effective to deprive a district court of jurisdiction."); *see also United States v. Riolo*, 398 F. App'x. 568, 571 (11th Cir. 2010); *Nascimento v. Dummer*, 508 F.3d 905, 910 (9th Cir. 2007); *Sheet Metal Workers' Int'l Ass'n Local 19 v. Herre Bros.*, Inc., 198 F.3d 391, 394 (3d Cir.1999); *United States v. Rodgers*, 101 F.3d 247, 251–52 (2d Cir. 1996).

Roe's motion to dismiss Doe's defamation claim presents the following issues for resolution: (i) whether Doe's defamation claim is time-barred, (ii) whether Roe is entitled to either absolute or qualified immunity for her statements to Marymount investigators and others accusing Doe of sexual assault, and (iii) whether Doe's complaint identifies the defamatory statement(s) with sufficient specificity to survive a motion to dismiss.  Because these legal issues have been fully briefed and argued, the matter is now ripe for disposition.

I.

The facts recited here are derived from plaintiff's complaint and must be accepted as true at this stage.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Doe, a subject of the United Kingdom, was an undergraduate student at Marymount between August 2014 and August 2016.  Roe, a citizen of the Commonwealth of Virginia, was also a student at Marymount at that time and ultimately graduated in 2017.  Doe and Roe first came into contact with one another in November 2014, when Roe contacted Doe by text message.  The two arranged for Roe to visit Doe's dorm room on November 8, 2014.

On November 8, Roe arrived at Doe's room at 6:06 p.m. and the two talked for about twenty minutes in the presence of Doe's roommate.  The complaint alleges that when Doe's roommate left the room, Doe and Roe "began to make out" and "fondle each other," but that neither touched the other's genitals.   Compl. ¶ 65.  The complaint further alleges that after approximately thirty minutes Roe got up and said she wanted to go visit some other friends.  Doe purportedly "stood up and leaned against the door, in a friendly, playful effort to persuade [] Roe not to leave, [but] he did not forcefully restrain her from leaving."  *Id.* ¶ 67.  Thereafter, according to the complaint, Roe kissed Doe on the cheek, told him she needed to meet some friends, and then left his room without incident.

At 8:10 p.m., approximately one hour later, Doe texted Roe telling her that he was "hanging out" with his friends and asking her what she was doing.  Roe responded at 8:23 p.m., asking "Y'all aren't going out," and then stating "I'm eating pizza haha."  *Id.* ¶ 70.   After that exchange, Doe texted Roe several times, but Roe "was slow to respond and did not appear . . . to be interested in meeting up again."  *Id.* ¶ 71.   On November 15, 2014, after receiving no communication from Roe, Doe texted Roe the following message: "So I don't mean to be [a] weirdo but I wanna ask what's up[?] [I]t's bothering me."  *Id.* ¶ 72.   Six days later, Roe responded to Doe's November 15 message, saying, "Hey, so I don't know what you remember about when I was in your room the other night, but you really scared me when you wouldn't take no for an answer.  I think you're a really nice guy, I really, really do, but you got really pushy and I just wanted to let you know . . . I hope you have an amazing weekend!!"  *Id.*   Doe replied to Roe's message stating, "Ok I'm sorry I frightened you, you have a good one too."  *Id.* ¶ 73. This text message was the last direct communication between Doe and Roe.

On the evening of November 8, 2014, the complaint alleges that Roe told another Marymount student, Z.M., that Doe had physically and sexually assaulted her.  Z.M. was apparently the first person with whom Roe shared her assault allegations.  According to the complaint, Roe did not tell anyone else about the alleged assault until late summer or early fall 2015, when she shared her allegations with her resident assistant C.S.[2]  C.S., in turn, filed a written report with Marymount, detailing Roe's assault allegations.  This report led Marymount

---

[2] Although the record does not reflect the exact date that Roe shared her allegations with C.S. or the date of C.S.'s report, it is reasonable to assume that Marymount initiated its investigation promptly after receiving C.S.'s report.

to initiate a Title IX investigation into the November 8, 2014 incident.   Doe was first notified by Marymount officials of Roe's allegations against him on September 8, 2015.[3]

As part of Marymount's investigation, Roe was interviewed by investigators on two separate occasions: October 1, 2015 and November 18, 2015.   According to the complaint, Roe made the following statements to Marymount's investigators in these interviews:[4]

- Roe told investigators that Doe held her down on the bed and tried to remove her clothes by force.

- Roe stated that Doe performed oral sex on her without her consent and that she "kneed him in the face" to stop him.

- Roe further stated that when she got up off the bed, Doe pushed her into the door and put his fist up her vagina while she was standing there.

- Roe claimed that Doe locked the door from the inside, preventing her from leaving.

- Roe finally alleged that Doe took off his pants and threw her on the bed, but that she "grabbed and yanked his penis," and he let her leave saying "if you don't want me, that's ok." *Id.* ¶ 105.

According to the complaint, Marymount's investigators also interviewed Roe's roommate, L.J., who told investigators that Roe had previously stated that she wanted to "climb [Doe] like a [expletive] tree" and wanted him to "throw [her] against the wall." *Id.* ¶ 76.   L.J. further reported to the Marymount's investigators that upon Roe's return to their shared dorm room on the evening of November 8, 2014, Roe was "happy and giddy," showed off her hickeys, and told her roommates that Doe was "good with his tongue." *Id.* ¶ 75. L.J. further stated to the investigators that after no one paid attention to Roe she started drinking heavily and her mood changed.   According to the complaint, L.J. told investigators that only after being ignored by her

---

[3] Doe claims that Roe initially told Marymount officials that the sexual assault occurred on November 25, 2014, seventeen days after Doe and Roe's only in-person meeting.

[4] Doe further alleges that the statements Roe ultimately made to Marymount's Title IX investigators differed significantly from C.S.'s original written report that was submitted to Marymount.

roommates and consuming alcohol did Roe claim that Doe had been "aggressive" with her and that she "didn't ask for it." *Id.* ¶ 76.  L.J. also allegedly told investigators that Roe was "good at making herself seem like a victim" and that she often "bent the truth." *Id.* ¶ 105.  Another female student, W.R., was also interviewed by investigators and confirmed that immediately following the alleged assault, Roe was bragging about the hickeys she received from Doe.

After interviewing the relevant parties, Marymount's investigators determined "that there [was] sufficient information alleged to suggest that violations of [Marymount's sexual misconduct policy] may have occurred."  On May 12, 2016, the investigators referred the matter for a hearing before an adjudicator.  The investigators reached this conclusion over Doe's repeated procedural objections.  In the complaint, Doe alleges that Marymount's procedures throughout the investigation were grossly inadequate and were designed to ensure that male students were found guilty of sexual assault.  Specifically, the complaint identifies the following deficiencies: (i) that Doe was permitted to speak with his attorney for fewer than two minutes during his initial meeting with Marymount's investigators; (ii) that Marymount refused to allow Doe's attorney to review the draft investigative report; (iii) that Doe was not given his own copy of the investigative report, but was instead allowed to take notes after reviewing Marymount's copy of the report; (iv) that the investigative team overruled Doe's objections to the report and included objectionable information in the final report that was provided to the adjudicator; (v) that Marymount refused Doe's request to meet with the adjudicator in person; (vi) that the adjudicator refused to consider any evidence other than Doe's and Roe's competing written accounts of the event (including exculpatory evidence Doe had provided); (vii) that Marymount denied Doe access to records concerning the investigation and adjudication, *i.e.* he was given no formal discovery; (viii) that Doe was not allowed to call any witnesses or to present any

documentary evidence; (ix) that Doe was not allowed to confront or to cross-examine Roe; and (x) that Marymount subsequently allowed a biased individual to serve as a Title IX adjudicator, evidencing its intent to adjudicate male students guilty of sexual assault.

Over Doe's objections, the report prepared by Marymount's investigators was provided to the adjudicator. The adjudicator also considered Doe's written statement, which was submitted on June 27, 2016, and Roe's written statement, which was submitted on June 30, 2016. On the basis of this record, which Doe claims was deficient in several respects, including the failure to include and assess exculpatory evidence, the adjudicator determined by a preponderance of the evidence that Doe had violated Marymount's sexual misconduct policy on November 8, 2014, and recommended suspending Doe from Marymount through the summer semester of 2018. The adjudicator issued his decision on July 11, 2016.

Doe appealed the adjudicator's decision, but this appeal was ultimately denied on August 8, 2016. Roe also submitted a written statement to the appellate adjudicator in response to Doe's appeal. Roe's final written statement was submitted on July 21, 2016.

Following his suspension from Marymount, Doe sued Roe for defamation, alleging that Roe made at least six defamatory statements wrongfully accusing him of sexual assault:

i.    Roe's November 8, 2014 statement to her fellow student, Z.M., that Doe sexually assaulted her;

ii.   Roe's September 2015 statement to her resident assistant, C.S., that Doe sexually assaulted her;

iii.  Roe's October 1, 2015 interview with Marymount investigators where she reported her version of the alleged sexual assault;

iv.   Roe's November 18, 2015 interview with Marymount investigators where she again reported her version of the alleged sexual assault;

v.    Roe's June 30, 2016 written statement to the adjudicator; and

vi.   Roe's July 21, 2016 written statement to the appellate adjudicator.

In response to Doe's lawsuit, Roe filed a motion to dismiss on July 5, 2017, arguing (i) that Doe's defamation claim is time-barred because Roe first reported the sexual assault more than one year before Doe filed this lawsuit and each retelling of her story was a single publication relating back to her original statement in November 2014; (ii) that Roe is entitled either to absolute or to qualified immunity for her statements because her statements were made in good faith as part of a quasi-judicial proceeding; (iii) that because Doe pled "on information and belief" that a defamatory statement was made, he failed to identify the specific defamatory statement, as required by Virginia law.

In his response in opposition, Doe contends (i) that the single-publication rule does not apply in this case because Roe made several statements to various people at different times, each of which constituted a republication of the alleged defamation; (ii) that Roe's is entitled to neither absolute nor qualified immunity because the investigatory process at Marymount in no way provided due process to the accused or approximated a judicial proceeding and Roe acted maliciously in reporting the alleged assault; and (iii) that the complaint adequately identifies both the content and timing of the defamatory statements.

**II.**

As a preliminary matter, Doe concedes that any defamatory statements Roe made before March 2016 are time-barred by Virginia's one-year statute of limitations.[5]   Doe contends, however, that Roe remains liable for the two allegedly defamatory statements made in June and July 2016 to Marymount adjudicators.  Roe challenges this assertion, arguing instead that all of

---

[5] Virginia Code § 8.01-247.1 provides that "[e]very action for injury resulting from libel, slander, insulting words, or defamation shall be brought within one year after the cause of action accrues."

her statements, even if defamatory, are time-barred because they collectively constitute a single publication relating back to her original November 2014 statement.

Section 577A of the Second Restatement of Torts, which is followed in Virginia,[6] distinguishes between a single publication and separate publications of a defamatory statement. A single publication of a defamatory statement includes (i) "a single communication heard at the same time by two or more third persons;" and (ii) "[a]ny one edition of a book or a newspaper, or any one radio or television broadcast, exhibition of a motion picture or similar aggregate communication." Restatement (Second) of Torts § 577A (1977). By contrast, where the same defamer communicates a defamatory statement on several different occasions to the same or different audience, each of those statements constitutes a separate publication. *Id.*[7]

This distinction is significant because where there has been a single publication of a defamatory statement, the single publication rule "limits tort claims to a single cause of action that accrues upon the first publication of the communication." 53 C.J.S. *Libel and Slander; Injurious Falsehood* § 98 (2017). Accordingly, with respect to a single publication, the statute of limitations begins to run when the first publication is made and subsequent distribution of that statement does not "start the statute of limitations running anew." *Katz v. Odin, Feldman & Pittleman, P.C.,* 332 F. Supp. 2d 909, 918 (E.D. Va. 2004) (citation omitted). By contrast, where there are separate publications of the same defamatory statement, a new cause of action, and thus a new statute of limitations, accrues with each republication. *See Semida*, 863 F.2d at 1161 ("[A]

---

[6] *See Semida v. Rice*, 863 F.2d 1156, 1161 n.2 (4th Cir. 1988) ("The single publication rule set forth in Restatement (Second) Torts § 577A is followed in Virginia." (citing *Morrissey v. Morrow & Co., Inc.*, 739 F.2d 962, 967 (4th Cir. 1984)).

[7] The Restatement provides the following illustrative example of separate publications:

> On one occasion A says to B that C is a murderer. On a later occasion A repeats the same statement to B. On a third occasion A makes the same statement to D. Each of the three communications is a separate publication and C has three causes of action against A.

Restatement (Second) of Torts § 577A cmt. a.1.

republication of the defamatory letter . . . would constitute a separate defamation and thus a new cause of action."). Thus, the question presented here is whether all six of Roe's allegations of sexual assault constitute a single publication or whether each individual statement constitutes a separate publication governed by its own statute of limitations.[8]

The plain text of the Restatement makes clear that Roe's statements are separate publications. As described above, the Restatement provides that "each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises." Restatement (Second) of Torts § 577A cmt. a. Here, the same alleged defamer, Roe, made several communications regarding the same defamatory matter, the alleged sexual assault, to various third parties, including to a peer on November 8, 2014, to her resident assistant in September 2015, to Marymount investigators on October 1, 2015 and again on November 18, 2015, to the Title IX adjudicator on June 30, 2016, and to the Title IX appellate adjudicator on July 21, 2016. The plain text of the Restatement thus compels the conclusion that each of these statements, including Roe's June 30 and July 21 statements to Marymount adjudicators, are separate and distinct publications. Accordingly, the single publication rule does not apply, and thus each

---

[8] It is unclear whether under Virginia law the single publication rule applies only to mass communications, *i.e.* the distribution of newspapers, books, internet posts, etc., or whether it also applies in situations where, as here, an individual makes a number of verbal or written statements to another individual or group of individuals. Some courts have broadened the single publication rule to include the statements of individuals, *see, e.g.*, *Miller v. Collectors Universe, Inc.*, 159 Cal. App. 4th 988, 998, 72 Cal. Rptr. 3d 194, 201 (2008) ("Despite the single publication rule's original focus on mass communications, the California Supreme Court has recently held the rule applies to all publications, including those that receive only limited circulation."), while other courts have limited the application of the rule to mass distribution of the same defamation, *see, e.g.*, *Shanklin v. Fernald*, 539 F. Supp. 2d 878, 883 (W.D. Tex. 2008) ("Texas applies the 'single publication' rule in libel cases on the last day of mass distribution to the public."). Analysis proceeds here on the assumption that in Virginia the single publication rule is not limited to cases of mass distribution.

defamatory statement is governed by its own one-year statute of limitations, not by the statute of limitations period beginning with Roe's first statement to Z.M. on November 8, 2014.[9]

This result might well have been different had Roe's statement to her resident assistant (which was recorded in a written report) then been distributed to various individuals throughout the investigatory and adjudicatory processes without Roe affirmatively republishing her story.  In other words, Roe may have been able to invoke the single publication rule had she told individual A that Doe sexually assaulted her and then individual A's report was provided to individuals B, C and D.  *See Semida*, 863 F.2d at 1161 (finding single publication rule applied where copy of defendant's letter was sent by third party to other individuals).  But that is not what happened here.  A particular statement made by Roe was not distributed to various individuals, but instead Roe knowingly and repeatedly republished her account of the incident on November 8, 2014 to other third parties.  Thus, the result in this case is clear: Roe's statements are separate publications, and as such, all publications prior to March 2016 are barred and those after are not.

Case law interpreting the single publication rule supports the conclusion reached here. Indeed, *Lewis v. Gupta*, 54 F. Supp. 2d 611 (E.D. Va. 1999) is on all fours with this case.  In

---

[9] Some courts have considered several factors in determining whether the single publication rule applies, namely the similarity of content, the identity of the audience, the timing of the publications, and the defendant's control over republication.  *See, e.g.*, *Martin v. Daily News L.P.*, 121 A.D.3d 90, 103, 990 N.Y.S.2d 473, 483 (N.Y. App. Div. 2014); *Lyssenko*, 2010 WL 1286757, at *5.  Here, Roe's statements are similar in nature, *i.e.*, Doe sexually assaulted Roe on November 8, 2014.  However, the precise details of the assault allegedly varied upon each retelling.  Thus, this factor is neutral at best because Doe alleges that Roe included new or different information with each retelling of her account. The remaining factors, however, conclusively demonstrate that Roe's multiple statements are separate publications.  Specifically, Roe's statements were made at different times over the course of two years, they were targeted at different audiences, and Roe had control over each republication.  For example, the implications of telling a peer you have been sexually assaulted and telling a university official you have been sexually assaulted are quite different.  Additionally, if Roe's statements were indeed false—a question that must be determined by the trier of fact—Roe could have withdrawn the allegedly false statements before repeating them to various university officials at each stage of the investigatory and adjudicative processes.  Based on these factors and others, each of Roe's statements was a separate and distinct publication.

*Lewis*, the plaintiff's ex-girlfriend accused the plaintiff of sexual assault, and in response, the plaintiff filed a lawsuit claiming his girlfriend's allegations were false and defamatory. Specifically, plaintiff asserted two different defamation claims, including: (i) a claim based on his ex-girlfriend's accusations in a conversation with an Assistant Commonwealth's Attorney and other law enforcement officials on December 1, 1997; and (ii) a claim based on his ex-girlfriend's accusations that same day in a separate conversation with two different Assistant Commonwealth's Attorneys and an Arlington police detective. The plaintiff's ex-girlfriend moved to dismiss the lawsuit, arguing that the single publication rule applied and plaintiff only had one cause of action for each of the allegedly defamatory statements. The district court expressly rejected this argument, holding that the defamatory statements were separate statements and gave rise to separate causes of action because "no matter on how many separate occasions one may utter slanderous words about another (though all may refer to the same transaction) each slander constitutes a new cause of action." *Lewis*, 54 F. Supp. 2d at 618 (internal citation and marks omitted).

The facts in *Lewis* are virtually indistinguishable from the facts in this case. The defendant there allegedly made multiple false reports to law enforcement that she had been sexually assaulted. Likewise here Roe allegedly made multiple false reports to fellow students and university officials that she had been sexually assaulted. And in *Lewis*, as in this case, the single publication rule did not apply and the defendant's separate statements gave rise to distinct causes of action.

Plaintiff argues unpersuasively that *Katz v. Odin, Feldman & Pittleman, P.C.*, applies here; but the *Katz* case is inapposite. There, the defendant made two allegedly defamatory statements to an arbitration panel: the first was defendant's June 28, 2002 letter to the arbitration

panel and the second was a distribution of the same letter during the course of the June 30, 2003 arbitration hearing.   The court in that case applied the single publication rule because it determined that the verbatim recitation and distribution of the contents of a previously published letter did not constitute separate and distinct publications.   The distribution in the *Katz* case is plainly the kind of conduct the single publication rule was designed to address,[10] but verbatim recitation or distribution of the contents of an original statement is not what we have in this case. Here, Roe made multiple *different* statements to various students and officials over the course of several years that Doe sexually assaulted her.   Because Roe did much more than redistribute an original letter or report, her reliance on *Katz* is misplaced.

As confirmed by the Restatement and the applicable case law, Roe's six statements to Z.M., C.S., Marymount investigators, and the two Marymount adjudicators were separate and distinct publications, not a single publication.   Accordingly, the single publication rule does not apply, and each statement gives rise to its own cause of action and its own statute of limitations. Because Doe's defamation claim was filed on March 31, 2017, and Roe concedes that her last two statements were made in June and July of 2016, Doe's defamation claim is timely as to the June and July 2016 statements.   None of her earlier statements, however, can be used to support Doe's defamation claim because they are time-barred.[11]   In sum, Roe's statute of limitations argument fails as it relates to her June and July 2016 statements, and her motion to dismiss must be denied in this respect.

---

[10] *See Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 173 (Tex. 2003) (holding that the single publication rule was designed "to protect publishers from repeated liability based on old publications that might be reprinted or back ordered").

[11] As previously noted, Doe concedes that all of Roe's statements predating March 2016—including her statement to Z.M., her statement to her resident assistant, and her initial statements to university investigators—are time-barred. Not addressed here, however, is whether these earlier statements may be relevant and admissible with respect to Doe's remaining defamation claim.

### III.

Given that Roe's June and July 2016 statements are not time-barred, it is necessary to consider whether, under Virginia law, Roe is entitled either to absolute or to qualified immunity for her statements. Roe argues (i) that she is entitled to absolute immunity because her statements were made as part of a quasi-judicial proceeding; (ii) that she is entitled to absolute immunity as a victim of sexual assault; and (iii) that she is entitled to qualified immunity as her report was made in good faith. Each of these arguments is addressed in turn.

### A.

Roe first argues that Marymount's Title IX investigation was a quasi-judicial proceeding, and as such, Roe is entitled to absolute immunity for the statements she made during that investigation. In Virginia, it is well-settled that a testifying witness enjoys absolute immunity for any defamatory statements made during a judicial proceeding, provided those statements are relevant to the subject matter of the proceeding. *See Shabazz v. PYA Monarch*, *LLC*, 271 F. Supp. 2d 797, 803 (E.D. Va. 2003) (citing *Darnell v. Davis*, 190 Va. 701, 707 (1950)).[12] The Supreme Court has recognized that absolute immunity in this context assures that "witnesses can perform their [] functions without harassment or intimidation," while, at the same time, "the safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling [] conduct." *Butz v. Economou*, 438 U.S. 478, 512 (1978). But importantly, this privilege is not limited to judicial proceedings; the Supreme Court of Virginia has made clear that absolute privilege extends also to communications in quasi-judicial proceedings, "made before tribunals having attributes similar to those of courts." *Penick v.*

---

[12] This rule also obtains in other contexts. For example, the Supreme Court has held that testifying witnesses in trials and grand jury proceedings are entitled to absolute immunity from § 1983 actions. *See Briscoe v. LaHue*, 460 U.S. 325, 330–46 (1983) (holding that jurors and witnesses enjoy absolute immunity at common law); *see also Rehberg v. Paulk*, 566 U.S. 356, 367 (2012) ("The factors that justify absolute immunity for trial witnesses apply with equal force to grand jury witnesses.")

*Ratcliffe*, 149 Va. 618, 628 (Va. 1927).  In determining whether a proceeding is quasi-judicial in nature, "[courts] have stressed elements associated with notions of due process," including requirements for notice, a hearing, an unbiased adjudicator, and the ability to marshal, present, and cross-examine evidence.  *Katz*, 332 F. Supp. 2d at 921.[13]

Here, the disciplinary proceedings against Doe in no way provided due process or approximated a judicial proceeding, and as such, it is inappropriate to extend absolute immunity to the participants in this process.  The complaint alleges that Doe was not permitted to present exculpatory or documentary evidence, to call witnesses, or to confront and cross-examine his accuser, and significantly, Doe was denied the opportunity to have an in-person hearing before either adjudicator.[14]   On these grounds alone, Roe's absolute immunity argument fails. Moreover, it is questionable whether a private university's disciplinary proceedings should ever be considered "quasi-judicial."  *See Cuba v. Pylant*, 814 F.3d 701, 716 (5th Cir. 2016) (holding that Southern Methodist University, "a private institution that does not have any law enforcement or law interpreting authority," cannot hold quasi-judicial proceedings).  Because Marymount is a private institution, it is arguable that none of its proceedings are quasi-judicial in nature and are

---

[13] *See, e.g.*, *Butz*, 438 U.S. at 513 (determining that participants in administrative agency adjudications are entitled to absolute immunity because "agency adjudication contain[s] many of the same safeguards as are available in the judicial process", including the fact that the proceedings are adversarial, the proceedings are conducted before an unbiased adjudicator, the parties are permitted to present oral or documentary evidence, and the parties are entitled to know findings and conclusions on all issues on the record); *Mock v. Chi., Rock Island & Pac. R.R. Co.*, 454 F.2d 131, 134 (8th Cir. 1972) (noting that the term "quasi-judicial" "is most generally applied where the function of the administrative body under consideration involves the exercise of discretion in the application of legal principles to varying factual situations and requires notice and hearing . . ."); *Elder v. Holland*, 208 Va. 15, 22 (1967) (rejecting claim that proceedings were quasi-judicial because adjudicator could not issue subpoenas, witnesses who testified falsely could not be convicted of perjury, and proceedings did not follow rules of evidence).

[14] In 2011, the Department of Education Office for Civil Rights issued a "Dear Colleague" letter, addressing the procedures that colleges and universities use to investigate and adjudicate sexual assault complaints.  *See* U.S. Dep't of Educ., Office of Civil Rights, Dear Colleague Letter (Apr. 4, 2011).  The letter emphasized that schools should use a preponderance of evidence standard to evaluate sexual assault complaints and discouraged cross-examination of accusers. *Id.* at 10-12.  Some commentators have argued that this "Dear Colleague" letter has contributed to the erosion of fundamental American principles of due process in sexual assault investigations on college campuses. *See, e.g.*, K.C. Johnson & Stuart Taylor Jr., *The Campus Rape Frenzy: The Attack on Due Process at America's Universities* (2017).

thus insufficient to trigger absolute immunity. In any event, that is a question for another day, for it is clear that quite apart from this point, Marymount's proceedings against Doe did not have the required guarantees of due process and fairness and therefore were not quasi-judicial so as to entitle Roe to claim absolute immunity from Doe's defamation claim.

**B.**

At oral argument, Roe also argued that she was entitled to absolute immunity for any information she provided to the Marymount as an alleged victim of a sexual assault. This argument is subtly different from Roe's previous argument because it focuses on Roe's role as a victim of crime, and not as a participant in a quasi-judicial proceeding. Despite this difference, for the reasons that follow, this argument also fails.

To begin with, there appears to be no published Virginia authority supporting the proposition that sexual assault victims are absolutely immune from liability for statements made during a Title IX investigation. To be sure, there are some decisions from other jurisdictions that support the general proposition that victims of crime and other participants in criminal investigations should be immunized for statements they make as part of those investigations.[15] These decisions, however, rely on the fact that these statements are made in anticipation of, and preparation for, a judicial process that affords full procedural due process protections to the accused.[16] But where, as here, the proceeding does not provide the same safeguards as the

---

[15] *See, e.g.*, *Borg v. Boas*, 231 F.2d 788, 794 (9th Cir. 1956) (holding that statements made in anticipation of a prosecution are absolutely immune); *Ledvina v. Cerasani*, 213 Ariz. 569, 574, 146 P.3d 70, 75 (Ct. App. 2006) (holding that statements to the police by victims of crime are absolutely immune); *Cutts v. Am. United Life Ins. Co.*, 505 So. 2d 1211 (Ala. 1987) (holding that an insurance company was immune from action for defamation for its participation in providing information to district attorney as requested in criminal investigation).

[16] *See, e.g.*, *Borg*, 231 F.2d at 794 ("It is hornbook learning that the actions and utterances in judicial proceedings so far as the actual participants therein are concerned and preliminary steps leading to judicial action of an official nature have been given absolute privilege."); *Ledvina*, 213 Ariz. at 573 (applying absolute immunity to a police report in part because "a complaint to police is the first step in a judicial proceeding"); *Cutts*, 505 So. 2d at 1215

judicial process, there appears to be no authority granting absolute immunity to putative victims who report crimes committed against them.  In any event, it would be inappropriate for this federal district court to create a new rule of Virginia state law without Virginia authority to support the extension of absolute immunity to all victims of sexual assault.  *See generally Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Congress has no power to declare substantive rules of common law applicable in a state . . . . And no clause in the Constitution purports to confer such a power upon the federal courts.").

Despite the lack of Virginia authority supporting the extension of absolute immunity to victims of sexual assault, Roe argues that a rule immunizing assault victims from civil suit would serve the important goal of permitting victims to "speak candidly and frankly with their universities." H'rg Tr. 15:19, Sept. 15, 2017, (Doc. 70).  Roe's argument is not without force. Research indicates that one in four college women have survived rape or attempted rape at some point in their lifetime, and five percent of women on college campuses experience rape or attempted rate every year.  *See Sexual Assault Statistics*, One in Four, http://www.oneinfourusa.org/statistics.php.  These victims face significant barriers to reporting the crimes perpetrated against them.  For example, college men and women identified (i) shame, guilt, embarrassment, not wanting friends and family to know; (ii) concerns about confidentiality; and (iii) fear of not being believed as significant barriers to reporting their sexual assaults.  Marjorie R. Sable et al., *Barriers to Reporting Sexual Assault for Women and Men: Perspectives of College Students*, J. Am. Coll. Health 157-62 (2006).  Women similarly rated a fear of retaliation by the perpetrator as an important barrier.  *Id.*  These fears and concerns would

---

(holding that summary judgment was proper on one count because "an absolute privilege exists in favor of those involved in judicial proceedings, including judges, lawyers, jurors, and witnesses").

undoubtedly be compounded if victims worried that every report they made would also be the subject of a defamation suit.

At the same time, it is important to recognize a competing policy concern, namely the impact of a false allegation of sexual assault on the life of an alleged perpetrator. Alleged perpetrators of sexual assault in the university context face potentially severe consequences, including suspension, expulsion and possible referral to law enforcement officials. Despite these potentially severe consequences, university proceedings, as described above, often provide limited procedural protections which fail to ensure that the alleged perpetrator is afforded a full and fair opportunity to defend him or herself.

These competing concerns suggest that qualified immunity, not absolute immunity, is the appropriate privilege to apply in circumstances like those at issue here. And in this respect, the Supreme Court of Virginia has made clear that "[t]he principle of qualified privilege protects a communication from allegations of defamation if made in good faith, to and by persons who have corresponding duties or interests in the subject of the communication." *Gov't Micro Res., Inc. v. Jackson*, 271 Va. 29, 43 (2006) (citing *Smalls v. Wright*, 241 Va. 52, 54 (1991)).[17] Once a qualified privilege attaches to a communication, "the plaintiff has the burden to prove that the privilege has been lost or abused, which must be shown by clear and convincing proof." *Cashion v. Smith*, 286 Va. 327, 338 (2013) (internal citations omitted). A plaintiff can prove the privilege has been lost or abused by showing:

> (1) the statements were made with knowledge that they were false or with reckless disregard for their truth; (2) the statements were communicated to third parties who have no duty or interest in the subject matter; (3) the statements were motivated by personal spite or ill will; (4) the statements included strong or violent language disproportionate to the occasion; or (5) the statements were not made in good faith.

---

[17] *See also Daniczek v. Spencer*, 156 F. Supp. 3d 739, 752 (E.D. Va. 2016) ("In the context of defamation, privilege may be qualified [] including communications 'made in good faith, to and by persons who have corresponding duties or interest in the subject of the communication.'").

*Id.* at 338-39 (internal quotations and citations omitted).

The balance struck by the qualified privilege doctrine in these circumstances addresses the competing interests of both putative victims and those claiming to be unjustly accused. On the one hand, the privilege encourages victims of sexual assault to speak candidly with university officials and to report abuse by immunizing their good-faith reports. Furthermore, because a plaintiff bears the burden proving the privilege was lost or abused, there is a presumption that the reports of victims of sexual assault are truthful. At the same time, the qualified nature of the privilege provides plaintiffs with an opportunity to overcome the privilege in those rare instances where a report is made, not in good faith, but rather with malice.[18]

In sum, given the lack of Virginia authority extending absolute immunity to crime victims and the competing concerns in this context, qualified immunity, and not absolute immunity, is the appropriate doctrine to apply to this case.

## C.

Given that qualified immunity is the appropriate doctrine to apply in this context, the question becomes whether Roe is entitled to that immunity at the motion to dismiss stage. As an initial matter, it is important to recall the pleading standard on a motion to dismiss. On a motion to dismiss, the law requires that the factual allegations in the complaint are taken as true and that every plausible inference is granted in favor of the plaintiff. *See Ashcroft*, 556 U.S. at 678. The complaint here alleges that on November 8, 2014, Doe had a romantic encounter with Roe and that nothing occurred that was extraordinary or memorable. The complaint further alleges that Roe, upon her return from this romantic encounter, was "giddy" and told her roommate that Doe

---

[18] Malice in Virginia is defined as "any controlling motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished." *Daniczek*, 156 F. Supp. 3d at 756 (citing *Hudson v. Lanier*, 255 Va. 330, 332 (1998)).

was "good with his tongue."  According to the complaint, it was only after Roe was ignored by her peers that Roe's mood darkened and her story changed.  Based on these allegations, which must be accepted as true for the purpose of reviewing Roe's motion to dismiss, a reasonable inference can be drawn that Roe had no good faith reason for reporting a sexual assault and that instead, she was motivated by personal spite or ill will.  Consequently, Roe is not entitled to qualified immunity at this time.  A more complete factual record, however, may warrant revisiting this immunity issue at the summary judgment stage or submitting the matter to a jury

It is well to note that this opinion in no way expresses a position on the question whether a sexual assault occurred on November 8, 2014.  The conclusion reached here is based exclusively on the allegations in plaintiff's complaint, assuming plaintiff's factual allegations are true and granting plaintiff the benefit of every plausible inference, as required by law.

## IV.

Roe's final argument is that Doe failed to identify the precise defamatory statement as required by Virginia law by pleading only "upon information and belief" that Roe accused him of sexual assault.  Roe argues that under Virginia law Doe is required to plead the allegedly defamatory statement with specificity.  But Virginia pleading standards are not controlling here; rather, it is Rule 8, Fed. R. Civ. P., that governs the outcome of Roe's motion to dismiss.  *Santos v. Christian*, 2015 WL 7738353, at *4 (E.D. Va. Nov. 30, 2015) (citing *Wuchenich v. Shenandoah Mem'l Hosp.*, 2000 WL 665633, at *14 (4th Cir. 2000)).  Under the federal pleading standards embodied in Rule 8, Fed. R. Civ. P., Doe is not required to plead the exact words of the defamatory statement, especially when Roe's own privacy rights preclude Doe from learning

the exact content of the statement.[19]   To conclude otherwise would allow Roe to use federal privacy laws to shield the defamatory statement from Doe's view while simultaneously dooming his defamation claim for failing to plead the exact content of the statement.   The law should not provide a litigant with a shield and a sword, but Roe demands exactly that.

All Doe knows is that Roe told different people on multiple occasions that Doe sexually assaulted her and that the latest statements were made in June and July 2016.   This is what Doe has pled, and at this stage, no more is required.[20]   There are few statements that carry comparable defamatory sting as being wrongfully accused of sexual assault.   Given the gravity of the allegations, Roe certainly remembers whether she accused Doe of sexually assaulting her, and if so, when.   She has been put on sufficient notice that Doe is accusing her of falsely accusing him of sexual assault.   Thus, plaintiff's complaint meets the standard set forth in Rule 8, Fed. R. Civ. P. and in *Twombly* and *Iqbal*, and Roe's motion to dismiss fails.

## V.

For the reasons stated in this Memorandum Opinion, defendant's motion to dismiss must be denied in all pertinent respects.   Plaintiff will, however, be precluded from relying on Roe's November 8, 2014, September 2015, October 1, 2015 and November 18, 2015 statements to prove his defamation claim.

---

[19] The Family Educational Rights and Privacy Act ("FERPA") is a federal law that protects the privacy rights of students in their educational records. Generally, schools must have written permission from the parent or eligible student in order to release any information from a student's education record.  *See* 20 U.S.C. § 1232g; *see also* 34 C.F.R. § 99.30 ("The parent or eligible student shall provide a signed and dated written consent before an educational agency or institution discloses personally identifiable information from the student's education records, except as provided in § 99.31.").  This requirement can be overcome, however, in compliance with a judicial order or lawfully issued subpoena.  *See* 34 C.F.R. § 99.31 ("An educational agency or institution may disclose personally identifiable information from an education record of a student without the consent required by § 99.30 if the disclosure . . .  is to comply with a judicial order or lawfully issued subpoena.").

[20] Although Doe will ultimately be required to prove the specific content of the defamatory statements of which he complains, he is entitled to the benefit of discovery before being required to quote Roe chapter and verse.

An appropriate order will issue.

Alexandria, Virginia
January 31, 2018

/s/

T. S. Ellis, III
United States District Judge